In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-1333

STEVE SCHLEICHER and LORRIE SCHLEICHER,

*Plaintiffs-Appellants*,

*v.*

THE SALVATION ARMY,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 06 C 545—**Richard L. Young**, *Judge*.

ARGUED FEBRUARY 13, 2008—DECIDED FEBRUARY 28, 2008

Before CUDAHY, POSNER, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*.   The Schleichers brought suit against their former employer, the Salvation Army, charging violations of the minimum-wage and overtime provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*. Invoking the "ministerial exception" (better termed the "ministers exception," to avoid the misleading connotation of "ministerial"—better still, as we'll see, to call it the "internal affairs" doctrine) to federal employment statutes, see, e.g., *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698 (2003), the district judge dismissed

the suit—though only after an evidentiary hearing—for want of federal jurisdiction. Fed. R. Civ. P. 12(b)(1).

The Schleichers were ordained (in the sense of authorized by a church to act in a clerical capacity) ministers of The Salvation Army, with the rank of captain, assigned to be the administrators of the Salvation Army's Adult Rehabilitation Center in Indianapolis. Ministers of the Salvation Army receive no wages, though they receive "an allowance . . . sufficient for basic needs." The allowance that each of the Schleichers received was only about $150 a week. That was below the federal minimum wage, given the number of hours they worked, which included overtime.

They were expelled from the Salvation Army for bringing this suit, and it is telling that they do not complain that their expulsion violated any law, although the Fair Labor Standards Act contains an anti-retaliation provision. 29 U.S.C. § 215(a)(3). (The Act also contains an exemption for persons "employed in a bona fide . . . administrative capacity," § 213(a)(1), but for unexplained reasons the Salvation Army has not invoked the provision.) If they charged retaliation, and the Salvation Army replied that they had been fired because their filing a suit seeking to enforce wage and overtime claims was inconsistent with their religious obligations as ministers and was thus an independent and adequate ground for firing them, the court would have to explore the religious doctrines of the Salvation Army that define the role of its ministers. Blocking such inquiries—such entanglements of the secular courts in religious affairs—is one of the grounds on which the ministers exception was devised as a rule of interpretation of employment laws that do not make explicit reference to religious organizations. Thus in

*Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036 (7th Cir. 2006), we held that the music director of a Catholic church could not maintain an age-discrimination suit against the church because it was apparent that the church's defense would be that it had fired him not because of his age but because of disagreement over the religious propriety of his musical choices, and to evaluate such a defense—to determine, that is, whether it was sincere or pretextual—would require a court to weigh in on issues of Catholic doctrine and practice. See also *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299 (4th Cir. 2004).

In reading into statutes of general applicability an exception favorable to religious organizations, the courts may seem to be flouting the doctrine of *Employment Division v. Smith*, 494 U.S. 872 (1990)—that the free-exercise clause of the First Amendment does not require the government to lighten the burden that a nondiscriminatory statute places on religious organizations, and thus that a law against mind-altering drugs can be applied to a religion that, however sincerely, deems the ingestion of such a drug a sacrament comparable to the Eucharist. But the ministers exception is a rule of interpretation, not a constitutional rule; and though it is derived from policies that animate the First Amendment, the relevant policies come from the establishment clause rather than from the free-exercise clause. The purpose of the doctrine is not to benefit marginal religions that, lacking the political muscle to obtain legislative protections of their rituals and observances, turn to the courts instead; it is to avoid judicial involvement in religious matters, such as claims of discrimination that if vindicated would limit a church's ability to determine who

shall be its ministers. The assumption behind the rule—for it is an interpretive rule—is that Congress does not want courts to interfere in the internal management of churches, as they sometimes do in the management of prisons or school systems. In a religious nation that wants to maintain some degree of separation between church and state, legislators do not want the courts to tell a church whom to ordain (or retain as an ordained minister), how to allocate authority over the affairs of the church, or which rituals and observances are authentic. The courts are not to resolve schisms or review excommunications. *Serbian Eastern Orthodox Dioceses v. Milivojevich*, 426 U.S. 696, 708-15 (1976). That is why the ministers exception is better termed the "internal affairs" doctrine, *Tomic v. Catholic Diocese of Peoria*, *supra*, 442 F.3d 1039; "ministers exception" is too narrow— remember that Tomic was not a minister. The point is simply that it is no more appropriate for courts to govern churches than for legislatures to do so.

Against the application of the doctrine in this case the plaintiffs point out that this is not a discrimination case, hence not a case in which the application of federal law would limit the right of a religious organization to decide who will perform religious functions—who will *be* the ministers. Compare *Petruska v. Gannon University*, 462 F.3d 294, 302-08 (3d Cir. 2006). They point out that the Supreme Court held in *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290 (1985), that "associates" of a religious organization were employees entitled to the protections of the Fair Labor Standards Act. The organization financed itself by operating commercial businesses, such as gas stations and grocery stores, staffed by drug addicts, alcoholics, and derelicts, who

had been converted and rehabilitated by the organization. Forcing it to pay minimum wages to the associates added to its costs, as would any application of a law of general application to a resisting organization, but did not require a court to adjudicate religious issues or to order a church to retain a minister whom it considered unfit on religious grounds.

It is different when as in this case the law is sought to be applied to a minister rather than to a lay employee who, unlike the music director in the *Tomic* case, has no religious function. We can begin to see this with the help of a regulation of the Department of Labor interpreting the Fair Labor Standards Act. Paraphrasing the statute, which defines "enterprise" as a set of related activities "performed . . . for a common business purpose," 29 U.S.C. § 203(r)(1) (the significance of the definition is that employees of "an enterprise engaged in commerce" are covered by the Act, e.g., §§ 206(a), 207(a)(1)), the regulation provides that when charitable, religious, or educational organizations "engage in ordinary commercial activities," those activities have the same status under the Act "as when they are performed by the ordinary business enterprise." 29 C.F.R. § 779.214. Much like the religious organization in the *Alamo* case, the Adult Rehabilitation Center that the plaintiffs administered operates thrift shops (five in number, with a total work force varying from 20 to 40) that sell donated goods to the general public. The income from the thrift shops helps to finance the Center, and the Salvation Army as a whole. Most of the employees of the thrift shops are, again much like the "associates" in the *Alamo* case, drunkards, drug addicts, and other unfortunates whom the Salvation Army is attempting to redeem. And the thrift shops' employees

are covered by the Fair Labor Standards Act, just as the Alamo Foundation's associates were held to be.

The plaintiffs were not employed by the thrift shops, however. Nor is the Adult Rehabilitation Center an ordinary business enterprise or merely an umbrella for the thrift shops. As the retired director of the Salvation Army's midwestern Adult Rehabilitation Centers testified without contradiction, a Salvation Army Adult Rehabilitation Center is a church, and, like a church, it is administered by church officials—the Salvation Army ministers who are, as the Schleichers were, appointed by the Salvation Army to administer it. The plaintiffs concede that an ordained minister who administers a church is not the employee of a religious organization "engage[d] in ordinary commercial activities," and so the question comes down to whether the fact that a church has a commercial dimension (the thrift shops, at least viewed from their customers' perspective) brings its ministers under the Fair Labor Standards Act.

The plaintiffs say it does, even in the following variant that we put to their able lawyer at oral argument. Suppose a monastery, whose monks take a vow of poverty and are paid no wages, sells the wine that the monks produce, in order to finance the operation of the monastery. See, e.g., "Wine-Tasting and Retreats at California Monastery," May 23, 2006, www.ajc.com/travel/content/travel/otherdestinations/us_stories/052406monastery.html (visited Feb. 14, 2008). The sale of wine is a commercial activity. The monastery competes with commercial enterprises. Are the monks therefore employees of a religious organization "engage[d] in ordinary commercial activities"? The Schleichers' lawyer unflinchingly answered yes. We answer no. The vow of

poverty is a hallowed religious observance; an intent to destroy it cannot reasonably be ascribed to the draftsmen of the Fair Labor Standards Act. No one could think the curious precapitalist economy of a monastery an ordinary commercial activity actuated by a business purpose.

A secularist might say that vows of poverty are passé, that the sale of wine or other products by monasteries is a vestige of the Middle Ages, and that if the monks are serious about poverty they can donate their minimum wages to the church. But to entertain such arguments would plunge a court deep into religious controversy and church management. Suppose the monks were paid the minimum wage but were asked to donate it back to the monastery. Suppose most of them did this but some did not, and the church expelled the recusants; would a court intervene; and if it did not, would not that as a practical matter nullify the application of the Fair Labor Standards Act to the monastery? That is what the Salvation Army did to the Schleichers, who have accepted their expulsion mutely. If that is the policy of the Salvation Army, as it appears to be, then however we rule no Salvation Army minister will ever receive the minimum wage. We are disinclined to take the first step on a path that leads so swiftly to so dead an end.

It is different with a thrift shop entirely managed and manned by persons who are not monks, priests, or other religious functionaries. The function of the Salvation Army ministers who administer the Adult Rehabilitation Centers is not to wait on customers of the thrift shops or manage one or more of the stores on a day to day basis; it is to manage a religious complex that includes thrift shops. The rehabilitation centers are self-contained religious communities for their residents, whom the Salva-

tion Army is trying to save. The centers include a chapel as well as living and dining areas, and the residents pursue courses of religious studies and devotions along with undergoing work therapy as employees of the thrift shops. The Schleichers admitted at the evidentiary hearing that their duties as administrators of the Indiana center had included "preaching," "leading worship singing," "overseeing or leading daily devotions," "overseeing or teaching Bible studies" to the residents, "overseeing or conducting Christian living classes" for them, and teaching "soldiers classes," which are classes for prospective Salvation Army ministers. In addition, the ministers circulate throughout the thrift shops "getting to know [the employees—the flock], getting to fellowship with them, but most importantly to minister to them, to talk to them about the condition of their soul."

Suppose a Catholic cathedral contains a gift shop that sells crucifixes, rosaries, religious postcards, and religious art. The employees of the gift shop are subject to the Fair Labor Standards Act; the bishop who administers the cathedral is not. The commercial tail must not be allowed to wag the ecclesiastical body. The plaintiffs concede that ministers engaged in ecclesiastical administration are not subject to the Fair Labor Standards Act no matter how closely their administrative duties resemble those of business employees. The Salvation Army's Adult Rehabilitation Centers are functional equivalents of cathedrals or monasteries, and the ministers who administer them are therefore engaged in ecclesiastical administration. The thrift shops, moreover, unlike (we take it) the gift shop in our hypothetical cathedral, have a religious function; salvation through work is a religious tenet of the Salvation Army. The sale of the goods in the

thrift shop is a commercial activity, on which the customers pay sales tax. But the selling has a spiritual dimension, and so, likewise, has the supervision of the thrift shops by ministers.

The best way to decide a case such as this, and one consistent with the evidentiary hearing that the district judge conducted, is to adopt a presumption that clerical personnel are not covered by the Fair Labor Standards Act. The presumption (which is consistent even with the fierce dissent from the denial of rehearing en banc in the *Shaliehsabou* case, see 369 F.3d 797, 803 (4th Cir. 2004)) can be rebutted by proof that the church is a fake, the "minister" a title arbitrarily applied to employees of the church even when they are solely engaged in commercial activities, or, less flagrantly, the minister's function entirely rather than incidentally commercial. Suppose a church received by inheritance a steel plant, and it happened to have among its ministers a former steel executive whom it assigned to manage the plant full time. The example is artificial given the exemption of administrative employees from the FLSA mysteriously not invoked in this case. But setting the exemption to one side, it would be a case of a bona fide minister who had, however, stepped entirely out of his religious role to manage a commercial enterprise full time.

None of these methods of rebuttal has been attempted by the plaintiffs in this case. The Salvation Army, which has existed in the United States since 1880, is acknowledged to be a completely legitimate church; our description of the Adult Rehabilitation Centers is not contested; and the Schleichers were properly ordained ministers.

The district judge made one mistake, though a harmless one. That was to dismiss the suit under Rule 12(b)(1)

of the civil rules. *Petruska v. Gannon University*, *supra*, 462 F.3d at 302-03. That rule is intended for cases that are not within the jurisdiction of the district court. Now it is true and important that federal courts, as we noted in the *Tomic* case, do not have jurisdiction to decide ecclesiastical controversies. 442 F.3d at 1037-38. A federal court could not entertain a suit to restore the Latin mass or to declare Christian Science a heresy. But it does have jurisdiction to decide cases brought to enforce the Fair Labor Standards Act. The fact that enforcement of the Act in a particular case would entangle the court in an ecclesiastical controversy would be a compelling reason to dismiss that case, but not a reason founded on a lack of jurisdiction over a plaintiff's claim that, as in this case, is based on the Fair Labor Standards Act rather than on anything to do with religion. Jurisdiction is determined by what the plaintiff claims rather than by what may come into the litigation by way of defense. *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 16 (1983); *Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 549 (7th Cir. 2003).

But it is entirely proper in a case like this for a defendant who is invoking the presumption that ministers' compensation is not subject to the Fair Labor Standards Act to move to dismiss an FLSA case under Rule 12(c) (judgment on the pleadings). If the plaintiff presents evidence to rebut the presumption, then, as the rule states, the defendant's motion for judgment on the pleadings is treated as a motion for summary judgment under Rule 56. It does not matter in this case, however, what rule the judge acted under, since he granted an evidentiary hearing at which the plaintiffs could have tried to present evidence that would have rebutted the presump-

tion, but did not. We therefore modify the judgment to base it on the lack of merits of the plaintiffs' claim rather than on any want of federal jurisdiction, and as so modified the judgment is

AFFIRMED.