2020 IL App (1st) 190699

No. 1-19-0699

Fourth Division
September 3, 2020

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| MARY SAMANO, | ) | |
| | ) | |
| Plaintiff-Appellee and Cross-Appellant, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| v. | ) | |
| | ) | No. 14 L 12883 |
| THE TEMPLE OF KRIYA, an Illinois Corporation, and | ) | |
| MELVIN HIGGINS, a/k/a Goswami Kriyananda, | ) | The Honorable |
| | ) | James E. Snyder, |
| Defendants | ) | Judge Presiding. |
| | ) | |
| (The Temple of Kriya, | ) | |
| Defendant-Appellant and Cross-Appellee). | ) | |
| | ) | |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justice Reyes concurred in the judgment and opinion.
Justice Delort specially concurred, with opinion.

**OPINION**

¶ 1     The instant appeal arises after a bench trial. The trial court found that defendant Temple of

Kriya[1] owed plaintiff Mary Samano overtime wages for work that she performed. Defendant

appeals, claiming that the trial court erred in finding in favor of plaintiff on all counts and in

_____

     [1]Codefendant Melvin Higgins died in April 2015, during the pendency of the proceedings below. Defendant was named as the sole legatee under his will, but he was never formally dismissed as a party in the instant litigation. Accordingly, we refer to defendant in the singular and refer to Higgins by name where applicable.

awarding plaintiff attorney fees. Plaintiff cross-appeals, claiming that the amount of attorney fees awarded should have been higher. For the reasons that follow, we reverse.

¶ 2                                                    BACKGROUND

¶ 3                                              I. Complaint and Answer

¶ 4        On December 12, 2014, plaintiff filed a three-count complaint, alleging violations of the Minimum Wage Law (820 ILCS 105/1 *et seq.* (West 2012)) and the Illinois Wage Payment and Collection Act (Wage Payment Act) (820 ILCS 115/1 *et seq.* (West 2012)). Plaintiff alleged that defendant was a business that conducted meditation, lecture sessions, meditation teacher training, Hatha yoga classes, and yoga instructor training and that operated a bookstore and website selling books, incense, candles, greeting cards, and other gift items to the public. Melvin Higgins[2] was the president and chief executive officer of defendant and had complete authority over defendant's employees, including their hiring and firing, the assignment of their tasks, and their compensation.

¶ 5        Plaintiff alleged that, in September 1999, she was hired by defendant as an apprentice in its yoga training program and was later elevated as the yoga training program director in 2006; she was paid by defendant in an amount decided by Higgins. In October 2008, in addition to her yoga duties, plaintiff was asked by Higgins to perform marketing work for defendant, for which she was paid at a rate of $11 per hour; Higgins raised the rate to $16 per hour in May 2011. Plaintiff alleged that, in December 2012, she informed Higgins that she believed that she was not being paid in accordance with the Wage Payment Act. On December 14, 2012, "without cause or provocation," Higgins terminated plaintiff's employment.

---

[2] Plaintiff testified at trial that Higgins was the "guru" at defendant temple.

¶ 6        Plaintiff alleged that her duties between January 2010 and December 2012 included teaching yoga classes, being a trainer, marketing, and website management. She was required to work, or to be available to work, both on-site and remotely seven days per week and was required to work an average of 60 hours per week. However, plaintiff alleged that she was paid for only 21.66 hours per week at a straight hourly rate of pay, no matter what hours she worked; plaintiff further alleged that Higgins instructed her to create invoices for defendant reflecting only 21.66 hours per week, rather than the full amount of time she actually worked. Plaintiff alleged that defendant failed to pay plaintiff for the hours she worked in excess of 21.66 per week and failed to pay her at an overtime rate of pay for the hours that exceeded 40 in a workweek.

¶ 7        Count I of the complaint was for violation of the Minimum Wage Law and alleged that defendant violated the statute by failing to pay her overtime. Count II was for violation of the Wage Payment Act and alleged that defendant violated the statute by failing to pay plaintiff her earned wages. Finally, count III was for retaliatory discharge under the Wage Payment Act and alleged that plaintiff was discharged after she complained that she was not being paid in accordance with the statute. For all three counts, plaintiff sought attorney fees in addition to compensatory damages.

¶ 8        In its answer and affirmative defenses, defendant alleged, *inter alia*, that it did not qualify as plaintiff's employer under the Wage Payment Act because plaintiff did not fall within the definition of an "employee" under the statute. Defendant also alleged that it did not qualify as plaintiff's employer under the Minimum Wage Law because plaintiff was not an "employee" under that statute. Specifically, defendant alleged that (1) plaintiff worked as a member of a

3

religious organization, (2) plaintiff was an independent contractor, and (3) any additional work was performed by plaintiff as a volunteer.

¶ 9                                    II. Trial

¶ 10      The matter proceeded to trial on April 10 and 11, 2017. Before trial, the parties submitted motions *in limine*. One of defendant's motions sought to bar any testimony or other evidence by plaintiff referencing conversations between her and Higgins, contending that they were barred by the Dead-Man's Act (735 ILCS 5/8-201, 8-301 (West 2016)). The court denied defendant's blanket motion, noting that "[a]spects of it are statement by statement," but finding that a blanket bar on all statements and evidence made in Higgins' presence was inappropriate.

¶ 11                                   A. Plaintiff

¶ 12      Plaintiff testified on her own behalf and was also called as an adverse witness in defendant's case-in-chief. Plaintiff testified that she first became involved with defendant in 1997, when she signed up for its yoga teacher training program. She then became an apprentice in the program until 2002, when she was asked to be an assistant teacher. In 2006, she became the director of the program and continued to serve in that role until she was terminated in December 2012. Plaintiff testified that she was a paid employee.

¶ 13      Plaintiff testified that, in October 2008, she was asked to take over certain responsibilities that had been handled by Eileen Ruffer, defendant's office manager and secretary, which included advertising and marketing. Plaintiff testified that she assumed this responsibility after speaking with Higgins, defendant's founder; plaintiff testified that her understanding after the conversation was that Higgins wanted her to work to lighten Ruffer's load because she was overwhelmed. Plaintiff was to be paid $11 per hour and would be responsible for website ads, print ads, fliers, brochures, and e-mail marketing and would also expand defendant's presence

on the Internet. Plaintiff testified that she would be working 2½ days per week, beginning in November 2008.

¶ 14    Plaintiff testified that she worked with Higgins on the contents of the marketing efforts. She explained that Higgins lived in France and that "nothing was done without his oversight and approval" with respect to defendant's operations. Higgins was her direct supervisor, and she communicated with him almost daily via e-mail, phone, or Skype. Plaintiff testified that she had no marketing experience prior to being hired by Higgins. When she began working on marketing, Ruffer installed Adobe Illustrator and Photoshop software onto plaintiff's computer and trained her on the software. Ruffer also taught plaintiff how to send marketing by e-mail.

¶ 15    Plaintiff testified that during the relevant period—January 2010 until December 2012— she worked directly for Higgins and was not supervised or directed by anyone else. She was required to obtain his approval in connection with what she did in the performance of her duties. Plaintiff testified that she was reimbursed by defendant whenever she had expenses and was authorized to use defendant's credit card for expenses related to her job responsibilities. Before she used the credit card, she was first required to obtain approval from Higgins.

¶ 16    With respect to her hours, plaintiff testified that the agreement was that she would work 2½ days a week. Plaintiff was not required to submit a time card but would receive defendant's checks from Ruffer once a month. Plaintiff testified that she worked from home but also spent time at defendant's temple. Plaintiff testified that, when she began the marketing responsibilities in 2008, "right off the bat" she was working three to four days a week, learning the marketing, but was being paid for only 2½ days.

¶ 17    In early 2009, plaintiff had a conversation with Higgins because the individual who was maintaining defendant's website could no longer do so. After the conversation with Higgins,

plaintiff's understanding was that Higgins wanted her to find an outside expert to maintain the website and to work with that individual. At the time, plaintiff had no experience in creating, managing, or maintaining a website. Plaintiff conducted interviews and ultimately selected Eric Gallegos, who was approved by Higgins. Plaintiff and Gallegos worked together, and plaintiff was the only contact between any other members of defendant's staff and Gallegos.

¶ 18     Plaintiff and Gallegos began by cleaning up the entire website, which was voluminous, including reorganizing links and correcting incorrect information for hundreds of items for sale. They then focused on regular maintenance, updating, and editing of the website. Plaintiff testified that, with this new project, her hours working for defendant increased.

¶ 19     In the fall of 2009, plaintiff met with Higgins when he came to visit Chicago. After that conversation, her understanding was that Higgins wished for her and Gallegos to customize a way for Higgins to livestream video and audio from Higgins' home in France to Chicago. The livestream would be broadcast on the Internet, as well as at defendant's main temple in Chicago on Sundays. Plaintiff testified that this was a "huge, huge project" that needed to be completely customized because Higgins lacked any technical knowledge other than being able to turn on the computer and log onto Skype. Plaintiff and Gallegos began this work in November 2009 and did not complete the project until the end of 2010. Plaintiff testified that, in connection with the new livestream, her marketing duties also increased, as defendant sought to reach as many people as possible through advertising on the Internet.

¶ 20     Plaintiff testified that by January 2010, with these additional projects, she was working 60 to 80 hours a week, seven days a week. She estimated that 15 to 20 hours were spent on marketing and advertising; 25 to 30 hours were for work on the website; 10 to 20 hours were on communications, including responding to e-mails and calls; and 5 to 10 hours were on

various miscellaneous projects for Higgins, such as updating his authored books for sale on Amazon or formatting handouts for livestream courses for defendant. Plaintiff testified that she also continued her yoga-related duties at the same time. Plaintiff was also responsible for hiring and supervising other employees; she testified that she hired 22 people and supervised 26 people between 2010 and 2012. She was the contact person for any issues or requests made by those she supervised, which then would need to be relayed to Higgins for his approval.

¶ 21        Plaintiff testified that she had approximately 45,000 e-mails from her work with defendant, which she reviewed in an attempt to reconstruct her activities. She selected one week per month for the time period between January 2010 and December 2012 and catalogued all of the activities related to her work for defendant, ultimately creating 36 "work logs" that recreated her work performed during that week. Plaintiff testified that these work logs refreshed her recollection as to the number of hours she worked during specific weeks, and her counsel showed her the created logs to refresh her recollection during her testimony in this case over defense counsel's overruled objection.

¶ 22        Plaintiff testified that, when she began her marketing duties, no one at defendant temple directed her to keep time records nor did anyone instruct her that she was required to record her activities as she was doing them. Plaintiff testified that she was told when she was hired that she would be given only 2½ days of pay and received defendant's checks from Ruffer reflecting that amount; the checks did not show any taxes withheld or other deductions. In June 2010, Ruffer and Higgins requested plaintiff to submit invoices "for legal purposes," and plaintiff submitted one invoice reflecting 2½ days per week for the prior six months and the next six months in time. In 2011, plaintiff's rate of pay was increased after she requested a raise, but she received no response to her request to be paid for the additional time. In

November 2012, after a conversation with another of defendant's employees, plaintiff became concerned that she was not being paid for the entirety of the time that she was working; she believed that defendant had misclassified her tax status, and she was concerned that she was violating the law. Plaintiff sent Higgins and Ruffer an e-mail in which she indicated that she believed she was properly classified as an employee, not an independent contractor, and asking them to correct her tax status. Plaintiff approached Higgins and had a conversation with him on December 14, 2012. After the conversation, plaintiff's understanding was that her employment had been terminated, which was confirmed after she received an e-mail from Higgins and learned that Ruffer had changed the locks and the passwords on the computer at defendant temple.

¶ 23    Plaintiff testified that Higgins directed everything she did, including where, when, and how to do her work. Plaintiff further testified that any expenses she incurred were preapproved by Higgins and she was reimbursed for them. Plaintiff did not have the ability to make a profit or loss based on the work she performed, nor did she consider herself free to perform work for others during the period of her employment. Plaintiff testified that she never had a written contract with defendant.

¶ 24    On cross-examination, plaintiff testified that Higgins was a guru and that she was a disciple of his at one time. She was also ordained as a swami in May 2005. Plaintiff testified that a swami was a priest and could conduct marriages, baptize, and conduct funerals. Plaintiff testified that she did not volunteer her time to defendant other than when she was acting as a priest. Plaintiff admitted that nobody ever expressly instructed her to work more than 20 hours per week but that "the workload implied that I should work well over 20 hours per week."

¶ 25                                          B. Eileen Ruffer

¶ 26          Ruffer testified on behalf of defendant that she had worked for defendant in various capacities since 1972. Ruffer testified that she worked on defendant's marketing briefly in 2008, which took approximately 8 to 12 hours every two months. Plaintiff took over the marketing and website work in November 2008. Ruffer testified that plaintiff never told her that she was working more than 20 hours per week until the fall of 2012. When plaintiff mentioned that she was "putting in a lot of hours and time," Ruffer instructed her to speak to Higgins about any complaints she had. To Ruffer's knowledge, no one asked plaintiff to work more than 20 hours per week.

¶ 27          On cross-examination, Ruffer testified that Higgins hired everyone who worked for defendant and determined pay rates. Ruffer further testified that plaintiff did not report to her and that the two did not have much interaction, as Higgins was plaintiff's primary contact.

¶ 28                                          C. James Chase

¶ 29          James Chase testified on behalf of defendant that he was the chairman of defendant's board of directors since 2013, shortly after plaintiff left defendant's employment. He was also serving as defendant's chief executive officer. Chase testified that defendant was a tax-exempt religious organization.

¶ 30          Chase testified that he was currently running defendant's operations and had been doing so since June 2013. Chase did not receive payment for his work but performed it on a volunteer basis. Chase reviewed the marketing performed by defendant and observed that "[t]here was really very little going on." Chase testified that he currently spent two to four hours a week on defendant's marketing. Chase further testified that streaming the Sunday services was not

complicated; on cross-examination, he testified that he had been involved in video editing and production since 1973.

¶ 31                    D. Trial Court Ruling

¶ 32     After both parties had rested and had presented closing arguments, the trial court found that "judgment is for the plaintiff." The court found that defendant was a religious organization and that "the nature of the business evolved over time as did the plaintiff's relationship to that business." The court found that plaintiff's testimony was largely unrebutted and that she was a "spiritual participant" in the organization but that she was additionally employed by defendant for technical services.

¶ 33     The court found that Higgins' role within the organization evolved from being related to defendant's physical location in Chicago to a broader focus on selling a product through the Internet, namely, DVD and book sales. The court found that the testimony established that defendant and Higgins developed a real-time projection into defendant's Chicago location, as well as a subscription service for the Internet downloads, and that "[t]his was described over and over and over again as the business of the organization and as the product of the organization and the source of revenue to [defendant]." The court noted that it was not "in any way, shape, or form tak[ing] lightly" defendant's contention that it was a religious organization and, therefore, exempt under the applicable statutes. However, the court found defendant's reliance on federal law unpersuasive, noting that "the state statute involved provides a specific statutory definition" that "exempts from the definition of employee a member of a religious corporation or an organization." The court found that defendant had the burden of establishing that plaintiff was a member of a religious organization but "hasn't put in any particular explanation about what it means to be a member of this organization." The court found that

10

the fact that plaintiff testified that she was a swami did not make the exemption applicable, as plaintiff was not arguing that her claims were applicable to work she did performing weddings or teaching yoga.

¶ 34    The court found that plaintiff was an employee; that the manner of her work was controlled by defendant at some level of detail, particularly by Higgins; and that plaintiff's testimony was "completely unrebutted, that every aspect of how she performed her work was controlled by him on behalf of the employer." The court found that "the balance of the evidence" established that plaintiff was an employee, not an independent contractor, and was not an exempt religious employee. The court further found that plaintiff did not fall under the volunteer exception, finding that "[a] volunteer is a person who performs their work with no promise or expectation of compensation. There's ample evidence of [a] promise [for] compensation, there's evidence of the expectation of compensation, and of the receipt of compensation. Years and years and years of it."

¶ 35    The court found that a three-year statute of limitations applied, and that plaintiff was only entitled to damages dating to December 12, 2011. The court found that plaintiff's testimony as to her work logs provided examples of work performed in excess of 40 hours in a given pay period. The court found that "[i]t's remarkable, no doubt, to say that one worked 84 hours in one week, but that testimony is entirely unrebutted." The court found that an appropriate damages calculation would be taking the hours above 40 and subtracting any yoga work.

¶ 36    With respect to plaintiff's retaliatory discharge claim, the court found that "it's absolutely unrebutted." The court continued:

"The plaintiff testified that she complained about her compensation, she complained about her concerns about the taxation of her compensation, and exactly this issue about

11

whether she was an employee, a contractor, et cetera, et cetera, and then was immediately fired. That remains unrebutted.

The reason *** why I make that finding separately is that *** it has been proved that the defendant conducted their business not in compliance with minimum wage laws and in retaliation against someone who complained of that. And to an extent it appears that they *** did not know what those laws were."

The court noted that Ruffer was "a remarkably credible witness, and a person who appeared to me to be entirely sincere about what she's trying to do" and that she testified that she knew only those aspects of employment law that were required to perform her job.

¶ 37    The court concluded by finding that "[t]he judgment's for the plaintiff including statutory penalty in attorney's fees." The court ordered the parties that "you're going to have to make an attempt to argue what you believe that number is to me by applying the method" it had explained. The court further found that it would only award damages for the 12 weeks within the statutory time period for which plaintiff had provided specific testimony and not for the entire year. The court found that "the theory that this week shows this and therefore we project that through the year is not a basis upon what damages will be."

¶ 38    On May 2, 2017, the trial court entered judgment in plaintiff's favor "on all counts" and awarded plaintiff compensatory damages in the amount of $75,000.[3] The court also granted plaintiff leave to file a petition for attorney fees, which plaintiff filed on May 9, 2017. In response to plaintiff's petition for attorney fees, defendant argued that the fees requested were

---

[3]We note that the record on appeal does not contain any briefs filed by the parties as to the damages calculation, nor is there a transcript or bystander's report concerning any hearing on the matter other than a purported "bystander's report" filed by defendant that was not approved by the trial court in accordance with Illinois Supreme Court Rule 323(c) (eff. July 1, 2017).

too high and that "Plaintiff's contingent fee agreement strongly indicates that any award of attorney's fees should be limited to the contingent fee upon which Plaintiff and her counsel agreed, or if none exists, a standard contingent fee of 33% of Plaintiff's judgment." In her reply, plaintiff claimed that there was no contingent fee agreement and the requested fees were reasonable.

¶ 39        On June 27, 2017, the trial court entered an order on plaintiff's fee petition. First, the court found it unnecessary to specify whether the fees were awarded pursuant to the Minimum Wage Law or the Wage Payment Act, since attorney fees were mandatory under Wage Payment Act claims. The court also found that the $75,000 judgment entered in plaintiff's favor on May 2, 2017, did not include statutory attorney fees and costs, as defendant claimed. The court then addressed defendant's contention that attorney fees be limited to the amount set forth in a contingency fee agreement between plaintiff and her counsel. The court found that "Plaintiff does not contest that a contingent fee agreement exists, but does not state the terms of that agreement." The court determined that, "[f]rom the record, it appears a contingency fee agreement exists, but it is unclear what the terms of that agreement are." The court noted that it was not obligated to limit attorney fees to the value of the contingency fee, but "the existence of a contingency fee is a factor this Court considers to determine the reasonable attorney's fees Plaintiff is entitled to recover." Finally, the court considered whether the fees sought were reasonable, applying a number of factors, and found that plaintiff was entitled to attorney fees of $35,000 and costs of $457.

¶ 40        On July 27, 2017, defendant filed a motion to reconsider and vacate the trial court's judgment. Defendant sought, in the alternative, (1) judgment in its favor, (2) a new trial, or

(3) a reduction in both the damages award and the award of attorney fees. On March 8, 2019, the trial court denied defendant's motion, and this appeal follows.

¶ 41                                                    ANALYSIS

¶ 42        On appeal, defendant claims that the trial court erred in denying its motion to reconsider because plaintiff failed to prove any of the three counts of her complaint. In the alternative, defendant claims that the trial court should have reduced the awards of damages and attorney fees. In her cross-appeal, plaintiff claims that the trial court's award of attorney fees was too low.

¶ 43        "The purpose of a motion to reconsider is to bring to the court's attention newly discovered evidence that was not available at the time of the original hearing, changes in existing law, or errors in the court's application of the law." *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 36. "A ruling on a motion to reconsider is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion." *Robidoux v. Oliphant*, 201 Ill. 2d 324, 347 (2002). " 'Abuse of discretion' is a versatile standard of review in that, depending on what the underlying issue is, it can lead to other standards of review." *Shulte v. Flowers*, 2013 IL App (4th) 120132, ¶ 22. "If a motion for reconsideration requests the court to change its mind about its factual findings, we will find no abuse of discretion in the granting or denial of the motion unless the court's revised factual findings, or the factual findings to which it decided to adhere, are against the manifest weight of the evidence." *Shulte*, 2013 IL App (4th) 120132, ¶ 22. "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). "A reviewing court should not overturn a trial court's findings merely because it does not agree with the

lower court or because it might have reached a different conclusion had it been the fact finder." *Bazydlo v. Volant*, 164 Ill. 2d 207, 214 (1995). In a bench trial, the trial court has the opportunity to weigh the evidence and make findings of fact, including being in a superior vantage point from which to observe and judge witnesses' demeanor and credibility, while a reviewing court has only a cold record in which to govern its decision-making process. *Racky v. Belfor USA Group, Inc.*, 2017 IL App (1st) 153446, ¶ 107. Thus, " '[t]he court on review must not substitute its judgment for that of the trier of fact.' " *Eychaner*, 202 Ill. 2d at 252 (quoting *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 434 (1991)).

¶ 44                                    I. Minimum Wage Law Claim

¶ 45        We first review the trial court's judgment in plaintiff's favor on count I of her complaint, regarding the Minimum Wage Law. Section 4a of the Minimum Wage Law provides:

> "Except as otherwise provided in this Section, no employer shall employ any of his employees for a workweek of more than 40 hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than 1½ times the regular rate at which he is employed." 820 ILCS 105/4a(1) (West 2012).

Defendant claims that the Minimum Wage Law is inapplicable to plaintiff's employment because she is not considered an "employee" under the statute. Defendant raises three arguments, each of which we discuss in turn.

¶ 46        Before doing so, however, we address defendant's claims as to the proper law to follow. Defendant's arguments are based almost entirely on federal law, with few citations to Illinois cases interpreting the Minimum Wage Law. This is understandable, as our courts have recognized that there is a "paucity of authority directly considering section 4a of the Minimum

Wage Law and its implementing regulations." *Kerbes v. Raceway Associates, LLC*, 2011 IL App (1st) 110318, ¶ 25. Indeed, the regulations promulgated by the Department of Labor provide that looking to federal law is appropriate:

"For guidance in the interpretation of the [Minimum Wage Law] and this Part, the Director may refer to the Regulations and Interpretations of the Administrator, Wage and Hour Division, U.S. Department of Labor, administering the Fair Labor Standards Act of 1938, as amended [(FLSA)] (29 U.S.C. 201 et seq.)." 56 Ill. Adm. Code 210.120 (2005).

¶ 47        However, defendant suggests that a violation of the Minimum Wage Law is *contingent* on establishing a violation under the FLSA and that, if an individual is not an "employee" within the scope of the FLSA, she cannot be an "employee" within the scope of the Minimum Wage Law. In other words, defendant claims that federal authority on this issue is binding on Illinois courts interpreting the Illinois statute, rather than merely persuasive. Defendant's position, however, is much too broad and does not represent an accurate statement of the law.

¶ 48        There are certain provisions of the Minimum Wage Law that expressly incorporate the FLSA's provisions and regulations. For instance, section 4a(2)(E) provides that section 4a(1) does not apply to "[a]ny employee employed in a bona fide executive, administrative or professional capacity, including any radio or television announcer, news editor, or chief engineer, as defined by or covered by the Federal Fair Labor Standards Act of 1938 and the rules adopted under that Act." 820 ILCS 105/4a(2)(E) (West 2012). Thus, *under that provision*, our courts have found that "[a] violation of the Illinois Minimum Wage Law is contingent on establishing a violation under the Fair Labor Standards Act of 1938." *Resurrection Home Health Services v. Shannon*, 2013 IL App (1st) 111605, ¶ 23. In the case at bar, however, the

provisions relied on by defendant do not contain such an express incorporation of the FLSA's language or regulations. Thus, in considering the parties' arguments, we will consider federal law "[f]or guidance" in the interpretation of the relevant provisions of the Minimum Wage Law (see 56 Ill. Adm. Code 210.120 (2005)) but consider such federal law to be persuasive, rather than binding, authority on this court. In that light, we turn to consideration of defendant's claims.

¶ 49                                    A. Member of Religious Organization

¶ 50         Defendant first claims that plaintiff is not an "employee" under the Minimum Wage Law because she was a member of a religious organization. Under the Minimum Wage Law:

> " 'Employee' includes any individual permitted to work by an employer in an occupation, but does not include any individual permitted to work:
>
> * * *
>
> (5) As a member of a religious corporation or organization." 820 ILCS 105/3(d) (West 2012).

The regulations promulgated under the Minimum Wage Law further provide:

> " 'A member of a religious corporation or organization' means an individual whose functions are spiritual or religious, such as a priest, rabbi, minister, nun, reverend or other such individuals who perform similar functions as their primary duties." 56 Ill. Adm. Code 210.110 (1996).

¶ 51         In the case at bar, defendant claims that the trial court found that it was a religious organization and that plaintiff's status as a swami, who performed religious functions such as marriages and funerals, and as a disciple shows that she was a "member of a religious

17

corporation or organization" (820 ILCS 105/3(d)(5) (West 2012)) who fell outside the purview of the Minimum Wage Law.

¶ 52       As noted, there is a lack of Illinois authority on this precise issue. Accordingly, we look to federal law for guidance. While the FLSA does not have the same express exclusion for members of religious organizations, at least two federal circuit courts have applied a " 'ministerial exception' " to bar FLSA claims that would require the "entanglements of the secular courts in religious affairs." *Schleicher v. Salvation Army*, 518 F.3d 472, 474 (7th Cir. 2008); *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 305 (4th Cir. 2004). But see *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 369 F.3d 797, 798 (4th Cir. 2004) (Luttig, J., dissenting) (arguing that the " 'ministerial' " exception did not apply to FLSA claims in response to the majority denying a petition for rehearing *en banc* for *Shaliehsabou*, 363 F.3d 299). Thus, for instance, ordained ministers of the Salvation Army were not permitted to seek compensation under the FLSA for their work in an adult rehabilitation center run by the organization. *Schleicher*, 518 F.3d at 478.

¶ 53       The "ministerial exception" arises from the first amendment of the United States Constitution and has been primarily applied in cases of employment discrimination. See *Hosanna-Tabor Evangelical Lutheran Church & School v. Equal Employment Opportunity Comm'n*, 565 U.S. 171, 188 (2012) (noting that, since the passage of antidiscrimination laws, federal appellate courts had uniformly recognized the existence of a "ministerial exception"). However, as noted, at least two federal circuit courts, including the Seventh Circuit, have also applied it to claims arising under the FLSA. See *Schleicher*, 518 F.3d at 478; *Shaliehsabou*, 363 F.3d at 305. The United States Supreme Court has set forth several factors that assist in the determination of whether the exception applies, although it has cautioned that no "rigid

formula" exists. *Hosanna-Tabor*, 565 U.S. at 190; see also *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. ___, ___, 140 S. Ct. 2049, 2062 (2020).[4] Such factors include the formal title given to the employee, the substance reflected in that title, the employee's use of the title, and the important religious functions performed by the employee. *Hosanna-Tabor*, 565 U.S. at 192. Additionally, the *Shaliehsabou* court noted that courts have applied a " 'primary duties' test" to determine whether an individual falls within the ministerial exception. *Shaliehsabou*, 363 F.3d at 306. Under this test, courts ask " 'whether a position is important to the spiritual and pastoral mission of the church.' " *Shaliehsabou*, 363 F.3d at 306. "In determining whether an employee is considered a minister for the purposes of applying this exception, we do not look to ordination but instead to the function of the position." *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 703 (7th Cir. 2003).

¶ 54     In the case at bar, the trial court found that the work for which plaintiff sought compensation was technical in nature and was separate from her spiritual work. The trial court found that, in essence, plaintiff's job was to manage an online store and to provide technical support for streaming Higgins' speeches, which the trial court found was not within the purview of the religious organization exception. In its finding, the trial court considered plaintiff's spiritual work as completely distinct from her secular work and did not discuss the effect that plaintiff's spiritual role had on the proper classification of plaintiff's work in the instant case. Additionally, the trial court's characterization of the work at issue strips it of any

---

[4]We gave defendant permission to cite the recently decided *Morrissey-Berru* decision in response to defendant's motion to cite additional authority. However, we note that defendant claims that *Morrissey-Berru* "expands" the scope of the ministerial exception but does not address whether such expansion should be retroactively applied to an employment relationship that terminated over seven years prior to the decision. Regardless of its applicability, we do not find that *Morrissey-Berru* has any impact on our result in the instant case.

context as to its relationship with defendant's mission as a whole. As a result, we must conclude that the trial court's finding was against the manifest weight of the evidence.

¶ 55    First, under the United States Supreme Court's framing, plaintiff would clearly be considered a "minister" of defendant temple. While that court has cautioned that there is no rigid formula, all of the factors that it pointed to in *Hosanna-Tabor* are present here, as well. Plaintiff held the title of swami, which she testified was a "priest" within defendant temple, as well as a disciple, and she used these titles with respect to her duties at defendant temple, including in e-mails admitted into evidence at trial. Her position as a swami involved performing important spiritual functions, such as conducting weddings, baptisms, and funerals. While her title alone "does not automatically ensure coverage, the fact that an employee has been ordained or commissioned as a minister is surely relevant." *Hosanna-Tabor*, 565 U.S. at 193. Thus, plaintiff's duties as a swami and a disciple alone would place her under the ministerial exception.

¶ 56    Additionally, the fact that the trial court found that the work for which plaintiff seeks to be compensated in the instant lawsuit consists of secular duties is not determinative by itself. As the *Hosanna-Tabor* Court noted, the ministerial exception is not limited to those who perform exclusively religious functions, and "[t]he heads of congregations themselves often have a mix of duties, including secular ones such as helping to manage the congregation's finances, supervising purely secular personnel, and overseeing the upkeep of facilities." *Hosanna-Tabor*, 565 U.S. at 193. Nor is the amount of time that an employee spends on religious versus secular functions determinative. As the Supreme Court noted, "[t]he issue before us *** is not one that can be resolved by a stopwatch. The amount of time an employee spends on particular activities is relevant in assessing that employee's status, but that factor cannot be considered

in isolation \*\*\*." *Hosanna-Tabor*, 565 U.S. at 193-94. Thus, the trial court in the case at bar should have considered the entire scope of plaintiff's employment in its analysis, rather than dividing it into its secular and religious aspects alone.

¶ 57 We find instructive the Seventh Circuit decision in *Schleicher*, in which ministers of the Salvation Army were barred from relief under the FLSA. There, the plaintiffs were assigned to be the administrators of the Salvation Army's adult rehabilitation center. *Schleicher*, 518 F.3d at 474. While the center included a thrift shop, the Seventh Circuit found that this work did not transform the center into a secular enterprise, as "[t]he function of the Salvation Army ministers who administer the Adult Rehabilitation Centers is not to wait on customers of the thrift shops or manage one or more of the stores on a day to day basis; it is to manage a religious complex that includes thrift shops." *Schleicher*, 518 F.3d at 477. The *Schleicher* court noted that there was no dispute that ministers engaged in ecclesiastical administration were not subject to the FLSA "no matter how closely their administrative duties resemble those of business employees," and the fact that the religious enterprise contained a commercial component did not change that result. *Schleicher*, 518 F.3d at 477. The court concluded that the "best way" to decide such a case was to adopt a presumption that clerical personnel were not covered by the FLSA. *Schleicher*, 518 F.3d at 477-78. Such a presumption could be rebutted "by proof that the church is a fake, the 'minister' a title arbitrarily applied to employees of the church even when they are solely engaged in commercial activities, or, less flagrantly, the minister's function [was] entirely rather than incidentally commercial." *Schleicher*, 518 F.3d at 478.

¶ 58 In the case at bar, the function of plaintiff's work was not just to send e-mails or maintain a website for a commercial enterprise, where defendant temple would earn money for religious

21

purposes. The reason for plaintiff's work cannot be removed from the work itself. We thus cannot agree with the trial court's characterization of plaintiff's work as entirely secular. Such a characterization strips plaintiff's work of any context as to its relationship with defendant's charitable mission as a whole. Instead, plaintiff's function was to disseminate the spiritual messaging of defendant temple in various forms to the public at large, in addition to her obviously religious functions as a swami and disciple.

¶ 59     Plaintiff testified that the items that were posted on the website were spiritual in nature, such as religious books and digital versions of Higgins' religious sermons. Plaintiff also described Kriya yoga, the type of yoga practiced at defendant temple, as the "creation of a spiritual center of study" and testified that the streaming service served as the liaison with the community with respect to this form of spiritual study. Thus, this is not the kind of situation where a religious entity is operating a wholly commercial enterprise. Instead, the present situation is one involving secular aspects of a larger religious whole—the purpose of the "nonreligious" parts of defendant's operations were to support defendant in its religious services.

¶ 60     Plaintiff's work with defendant temple is in large part similar to the work performed by the plaintiff in *Alicea-Hernandez*, who was found to fall within the ministerial exception. There, the Seventh Circuit found that both parties agreed that the plaintiff's duties included composing media releases and correspondence, as well as developing a working relationship with various constituencies and composing articles to be published in church media. *Alicea-Hernandez*, 320 F.3d at 703-04. The court in that case found that "[a] press secretary, as is evident from observing various public officials and entities, is often the primary communications link to the general populace. The role of the press secretary is critical in message dissemination, and a

church's message, of course, is of singular importance. *** '[D]etermination of whose voice speaks for the church is *per se* a religious matter.' " *Alicea-Hernandez*, 320 F.3d at 704 (quoting *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1356 (D.C. Cir. 1990)).

¶ 61    In the case at bar, plaintiff's work with defendant involved serving as a liaison between defendant and the community to whom it directed its message. See *Alicea-Hernandez*, 320 F.3d at 704. Plaintiff sent marketing e-mails to the community, placed advertisements in media, and regularly corresponded with those who had questions or problems. In addition, plaintiff's position as a swami and disciple strengthens the applicability of the ministerial exception, as there was no allegation in *Alicea-Hernandez* that the plaintiff in that case was an ordained minister.

¶ 62    We recognize that the Minimum Wage Law is not identical to the FLSA with respect to the ministerial exception, as the regulations promulgated by the Department of Labor contain a definition of a member of a religious organization as "an individual whose functions are spiritual or religious, such as a priest, rabbi, minister, nun, reverend or other such individuals who perform similar functions as their primary duties." 56 Ill. Adm. Code 210.110 (1996). However, as noted, courts analyzing the ministerial exception have also applied a " 'primary duties' test" to determine whether an individual falls within the ministerial exception. *Shaliehsabou*, 363 F.3d at 306. Thus, the federal cases considering the ministerial exception are instructive to the determination of whether the state exception applies, as well.

¶ 63    In the case at bar, considering the entirety of plaintiff's work with defendant temple, we can reach no conclusion other than that plaintiff is a "member of a religious corporation or organization" as contemplated by the Minimum Wage Law. Part of plaintiff's work was

23

overtly religious, as she was ordained as a swami and performed religious ceremonies in accordance with that role. The rest of plaintiff's work, while administrative or technical in nature, nevertheless had a religious component, as plaintiff disseminated communications about defendant and its mission, maintained a website for the sale of religious memorabilia and sermons, and facilitated a streaming service by which Higgins' religious messages would be spread more widely to the populace. In balancing plaintiff's duties, plaintiff performed religious functions as her primary duties because those duties were designed to spread the religious message of the temple, and consequently, the trial court erred in finding plaintiff to be an "employee" within the scope of the Minimum Wage Law. Plaintiff knew when she was hired that she would be paid for only 20 hours per week and that the work could exceed the hours she was being paid for.

¶ 64                                B. Volunteer and Independent Contractor Exceptions

¶ 65        Since we have determined that the trial court erred in finding that plaintiff was not a member of a religious organization, we have no need to consider whether plaintiff was a volunteer or an independent contractor.

¶ 66                                        II. Wage Payment Act Claims

¶ 67        Next, defendant argues that the trial court erred in granting judgment in plaintiff's favor on counts II and III of her complaint concerning the Wage Payment Act. Under the Wage Payment Act, an employer is required, at least semi-monthly, to pay every employee all wages earned during the semi-monthly pay period. 820 ILCS 115/3 (West 2012). Upon separation from an employee, the employer is required to pay the final compensation of the employee in full at the time of separation, if possible, but no later than the next regularly scheduled payday. 820 ILCS 115/5 (West 2012). The Wage Payment Act defines " 'wages' " as follows:

"For all employees, other than separated employees, 'wages' shall be defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." 820 ILCS 115/2 (West 2012).

¶ 68   In the case at bar, defendant claims that plaintiff's claims under the Wage Payment Act must fail because there was no employment contract or agreement between plaintiff and defendant. As an initial matter, we again note that defendant relies almost exclusively on federal law in support of its arguments. While this was necessary in the context of interpreting the Minimum Wage Law and was expressly supported by the statute's regulations, this is not the case with respect to Wage Payment Act claims, which have been the subject of numerous cases decided by Illinois courts. In our analysis, we rely on Illinois case law and not on federal court cases.

¶ 69   The applicable regulations provide a definition of an "agreement" in the context of the Wage Payment Act:

> " 'Agreement' means the manifestation of mutual assent on the part of two or more persons. An agreement is broader than a contract and an exchange of promises or any exchange is not required for an agreement to be in effect. An agreement may be reached by the parties without the formalities and accompanying legal protections of a contract and may be manifested by words or by any other conduct, such as past practice. *** An agreement exists even if it does not include a specific guarantee as to the duration of the agreement or even if one or either party reserves the right to change the terms of the agreement." 56 Ill. Adm. Code 300.450 (2014).

¶ 70    First, we note that there is no dispute that there was, at a minimum, an employment agreement providing that plaintiff would work for 2½ days a week in exchange for pay. The only dispute is whether there was an agreement for compensation for work in excess of 2½ days per week. We also note that defendant contends that plaintiff failed to plead any such employment agreement in her complaint and, therefore, was precluded from obtaining judgment based on violation of the agreement. Defendant claims that the only agreement alleged by plaintiff in support of her Wage Payment Act claims was an agreement that defendant "would comply in all respects with pertinent state and federal wage and hour laws." However, defendant's argument disregards all of the prior allegations of the complaint, which were incorporated into plaintiff's Wage Payment Act counts. Specifically, plaintiff's complaint alleged, *inter alia*, (1) that plaintiff was hired by Higgins to do marketing work at defendant temple in 2008; (2) that plaintiff's duties between January 2010 and December 2012 included teaching yoga classes, training, marketing, and website management; (3) that as part of her duties, plaintiff was required to work, or to be available to work, both onsite and remotely seven days a week; and (4) that, from January 2010 through December 2012, plaintiff was required to work an average of 60 hours per week. The fact that plaintiff specified in her Wage Payment Act counts that the parties agreed to comply with all state and federal wage laws does not negate the other allegations in her complaint as to the nature of her employment with defendant.

¶ 71    Notwithstanding, we cannot find that plaintiff established a violation of the Wage Payment Act. An employment agreement for purposes of the Wage Payment Act need not be a formally negotiated contract. *Landers-Scelfo v. Corporate Office Systems, Inc.*, 356 Ill. App. 3d 1060, 1067 (2005). "Because a contract is not necessary under the Wage [Payment] Act, a worker

seeking to recover under it does not need to plead all contract elements if she can plead facts showing mutual assent to terms that support the recovery." *Landers-Scelfo*, 356 Ill. App. 3d at 1068.

¶ 72    In the case at bar, we cannot find that plaintiff established mutual assent on the most critical part of her employment agreement with defendant—that she would be compensated for more than 2½ days of work. "[E]mployers and employees can manifest their assent to conditions of employment by conduct alone." *Landers-Scelfo*, 356 Ill. App. 3d at 1068. "Thus, an employer and an employee, by acting in a manner consistent with an employment agreement, can set the material terms of the agreement, including the amount of compensation ***." *Landers-Scelfo*, 356 Ill. App. 3d at 1068. When an at-will employee continues to work after a change in compensation plan, she is deemed to have accepted the change. *Geary v. Telular Corp.*, 341 Ill. App. 3d 694, 698 (2003).

¶ 73    Plaintiff testified that her workload required her to work more than 2½ days per week and that Higgins was aware of all of the work that she was doing. However, plaintiff also testified that, in 2011, she requested (1) an increase in her rate of pay and (2) to be paid for more than 2½ days of work. Plaintiff was given a $5 per hour increase in her rate of pay but received no response to her request to be paid for the additional hours that she claimed. When plaintiff continued working for defendant after that point in time, plaintiff acquiesced to the payment arrangement. There is absolutely no evidence that plaintiff and defendant ever mutually assented to pay plaintiff for any more than 2½ days per week, and there is no evidence that defendant required her to work more than 2½ days per week. Consequently, we must find that the trial court erred in entering judgment in plaintiff's favor on the Wage Payment Act claims.

¶ 74                                III. Attorney Fees

¶ 75        In light of our conclusion that judgment should have been entered in defendant's favor on all three counts of plaintiff's complaint, we have no need to consider the claims as to the award of attorney fees raised by plaintiff in her cross-appeal since the award of attorney fees is reversed as part of the judgment reversal in the case at bar.

¶ 76                                CONCLUSION

¶ 77        For the reasons set forth above, we reverse the trial court's judgment as to all three counts of plaintiff's complaint. First, the Minimum Wage Law does not apply to plaintiff, as she is not an "employee" for purposes of the statute because she is a member of a religious organization. Second, plaintiff's Wage Payment Act claims must fail where there was no evidence that the parties agreed to pay plaintiff for more than 2½ days of work. As a result, we have no need to consider the claims on plaintiff's cross-appeal concerning the award of attorney fees.

¶ 78        Reversed.

¶ 79        JUSTICE DELORT, specially concurring:

¶ 80        The majority finds that the circuit court's decision that Samano was subject to the ministerial exemption was against the manifest weight of the evidence. See *supra* ¶ 54. Section 3(d)(5) of the Minimum Wage Law, 820 ILCS 105/3(d)(5) (West 2012), declares that persons who are employed "[a]s a member of a religious corporation or organization" are not "employees" under the law and are therefore not subject to its the minimum wage and overtime protections. The Illinois Department of Labor has promulgated a regulation interpreting section 3(d)(5), which defines " '[a] member of a religious corporation or organization' " as "an individual whose functions are spiritual or religious, such as a priest, rabbi, minister, nun,

28

reverend or other such individuals who perform similar functions as their primary duties." 56 Ill. Adm. Code § 210.110 (1996).

¶ 81    Employees of religious organizations often perform both religious functions reserved to those ordained to a religious life (such as a rabbi who solemnizes a wedding) and secular activities widely done by nonreligious employees in the general workplace (such as editing a newsletter or ordering office supplies). See generally *supra* ¶¶ 53-63. This functional overlap requires a court to engage in a factual analysis. As one court has explained regarding the similar federal wage and hour rules: "And while 'applicability of the ministerial exception is a question of law for the court,' the subsidiary determination of whether a discrimination plaintiff was a minister is both factual and case-specific." *Collette v. Archdiocese of Chicago*, 200 F. Supp. 3d 730, 733 (N.D. Ill. 2016).

¶ 82    By granting judgment to Samano on count I of her complaint, the circuit court inherently found that the ministerial exemption did not apply to her. In a bench trial, the circuit court has the primary obligation to weigh evidence and determine disputed issues of fact, and we must defer to those findings of fact unless they are against the manifest weight of the evidence. *Klaskin v. Klepak*, 126 Ill. 2d 376, 389 (1989). "A factual finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence." *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 544 (2007).

¶ 83    Although Samano was an ordained swami and had engaged in some ministerial acts, there was ample evidence that she was primarily—if not overwhelmingly—engaged in activities that were widely performed by laypersons in nonreligious environments, such as television production, handling e-mails, marketing, and information technology work. The evidence

regarding the regularity and frequency of her performing ministerial acts such as presiding over religious ceremonies was much less compelling. Accordingly, the circuit court's determination that she did not fall under the ministerial exemption was not arbitrary, unreasonable, or not based in evidence. Therefore, I would not reverse the circuit court on the ground that Samano fell under the ministerial exemption in the Minimum Wage Law.

¶ 84    Since it found that Samano fell under the ministerial exemption, the majority had no need to examine whether the circuit court erred in holding that Samano's claim was not also barred by her status as a volunteer or an independent contractor. Because I do not join the majority's reasoning regarding the ministerial exemption, I must proceed to address the circuit court's finding that Samano did not perform her extra work on a volunteer basis. The defendant filed an affirmative defense to Samano's Minimum Wage Law claim, specifically alleging that she was not an "employee" under the law because she worked extra hours as a volunteer.

¶ 85    The regulations interpreting the Minimum Wage Law provide that volunteers are not subject to the law's protections. The regulations define " '[v]olunteer' " as "a person who works for an employer under no contract of hire, expressed or implied, and with no promise of compensation, other than reimbursement for expenses as part of the conditions for work." 56 Ill. Adm. Code 210.110 (1996). There was ample, and compelling, evidence at trial that Samano worked extra hours as a volunteer for many years without complaint or expectation of pay, and that her agreement with the defendant limited her paid hours to 2½ days per week. There was little, if any, contrary evidence.

¶ 86    But Samano argues that under the "volunteer" regulation, if an employee is paid for some hours of regular work, the employee must be paid for all hours worked, even if the additional hours were clearly done as a volunteer. There is some authority in federal law to this effect.

30

The United States Department of Labor's Fact Sheet on the Fair Labor Standards Act (FLSA) states:

"The FLSA recognizes the generosity and public benefits of volunteering and allows individuals to freely volunteer in many circumstances for charitable and public purposes. *** A volunteer generally will not be considered an employee for FLSA purposes if the individual volunteers freely for public service, religious or humanitarian objectives, and without contemplation or receipt of compensation. Typically, such volunteers serve on a part-time basis and do not displace regular employed workers or perform work that would otherwise be performed by regular employees. In addition, paid employees of a non-profit organization cannot volunteer to provide the same type of services to their non-profit organization that they are employed to provide." U.S. Dep't of Labor, Wage & Hour Division, Fact Sheet #14A: Non-Profit Organizations and the Fair Labor Standards Act (FLSA) (August 2015) https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/-whdfs14a.pdf [https://perma.cc/42UY-F32K].

¶ 87 The Supreme Court has further cautioned against refusing pay to employees who work "extra volunteer time," noting that "employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." *Tony & Susan Alamo Foundation v. Seccretary of Labor*, 471 U.S. 290, 302 (1985). However, no such evidence of coercion was produced at trial.

¶ 88 But the crucial distinction that renders this federal authority inapplicable here is that count I of Samano's complaint was brought under the Minimum Wage Law, not the federal Fair Labor Standards Act. The regulations interpreting the Minimum Wage Law contain no parallel provision to the FLSA's "same type of services" charitable volunteer rule, and Samano does

not argue that one exists or can be implied. Samano's interpretation of the Minimum Wage Law is simply not supported by the plain language of the statute, by its implementing regulations, or by case law.

¶ 89    Classifying Samano as a volunteer as to her extra hours is not facially irrational. Persons often volunteer to work at houses of worship by passing collection plates, ushering, singing as a choir member, or performing janitorial services—all without pay. Obviously, if a for-profit business claimed that an employee worked extra hours as an unpaid volunteer, that claim would be highly suspect since the employee would have no incentive to work as a volunteer under those circumstances. But an employee of a charity whose charitable mission the employee supports might well choose to work extra hours without pay.

¶ 90    For these reasons, I would hold that the circuit court's finding that the defendant's wage claim was based for work she performed as a volunteer was against the manifest weight of the evidence. I would therefore reverse the circuit court's judgment on count I, not on the ministerial exemption on which the majority relies, but rather because the circuit court's determination that Samano did not fall under the volunteer exemption in the Minimum Wage Law was against the manifest weight of the evidence.

¶ 91    I join the majority's analysis relating to counts II and III, so I concur that the judgment below should be reversed.

**No. 1-19-0699**

| | |
|---|---|
| **Cite as:** | *Samano v. Temple of Kriya*, 2020 IL App (1st) 190699 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-L-12883; the Hon. James E. Snyder, Judge, presiding. |
| **Attorneys for Appellant:** | John W. Bell, Joseph R. Marconi, David M. Macksey, and Brian C. Langs, of Johnson & Bell, Ltd., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Terrence J. Goggin, Terrence R. Goggin, and John F. Goggin, of Goggin & Associates, of Oak Brook, for appellee. |