2021 IL App (1st) 210413
No. 1-21-0413
Opinion filed December 30, 2021

THIRD DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| GAY ELLEN SOUCEK, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BREATH OF LIFE PROFESSIONAL | ) | No. 18 L 011243 |
| SERVICES, NFP, MARIA PRATO and | ) | |
| JACK PRATO, | ) | The Honorable |
| | ) | Margaret Brennan, |
| Defendants-Appellees. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    After a bench trial held via videoconferencing, the trial court entered judgment in favor

of defendants Maria and Jack Prato and Breath of Life Professional Services (Breath of Life).

Plaintiff Gay Ellen Soucek appeals.

¶ 2    Plaintiff brought this action against her former employer, Breath of Life, a not-for-profit corporation, and its principals, Maria and Jack Prato[1], to recover wages under the Illinois Minimum Wage Act (820 ILCS 115/1 *et seq.* (West 2018)) (Act). The Pratos formed Breath of Life to run a group home for their two disabled adult children.[2] Plaintiff, an overnight caregiver, worked 63 hours per week and received $200 weekly plus lodging.

¶ 3    In her complaint, plaintiff alleges, among other things, that defendants violated the Act by failing to pay her both overtime pay and a minimum wage. At trial, plaintiff testified that her total damage claim against Breath of Life, including a 2% penalty for wages owed and prejudgment interest, was $88,209.75. After trial, the trial court found: (1) that Breath of Life was exempt from paying overtime pay pursuant to a provision of the Act; and (2) that the value of plaintiff's lodging, plus her weekly $200 salary, satisfied the Act's minimum wage requirement.

¶ 4    For the following reasons, we reverse and remand.

¶ 5                                    BACKGROUND

¶ 6                              I. Pretrial Proceedings

¶ 7    Plaintiff's initial and amended complaints alleged claims pursuant to the Act and the Illinois Wage Payment and Collection Act (820 ILCS 115/1 *et seq.* (West 2018)) (IWPC). Later, at the subsequent bench trial, plaintiff moved to dismiss her IWPC claims, and that motion was granted. Thus, her IWPC claims are no longer part of this suit. In addition to wages owed, plaintiff sought attorney fees, costs, prejudgment interest and punitive damages.

---

[1] Since Maria and Jack share the same last name, we refer to them by their respective first names. When discussing both Maria and Jack, we refer to them as the Pratos. When referring to all three defendants collectively, we call them simply defendants.

[2] The issue of whether the Pratos should be in this case is not an issue before us.

Defendants' answers to plaintiff's initial and amended complaints admitted that plaintiff was hired as an overnight caregiver but denied any monies were owed and did not assert any affirmative defenses.

¶ 8    On June 25, 2020, plaintiff moved for summary judgment solely on claims under the Act. Plaintiff argued that that she worked 63 hours every week for $200 per week and that defendants had failed to carry their burden of proof to show that they were exempt from the Act's requirements to pay minimum wages and overtime compensation. Plaintiff argued that, while normally a plaintiff has the burden of proof to prove that she was entitled to the overtime payments, the employer has the burden of proof to establish that an employee falls within one of the Act's exemptions. Plaintiff argued that "[d]efendants['] basis" for exemption is "unknown," as defendants have not asserted or proved any of the Act's exemptions. In particular, plaintiff argued that defendants were precluded from claiming a caregiver exemption because Breath of Life was a third-party employer.

¶ 9    On August 13, 2020, defendants responded to plaintiff's motion and cross-moved for summary judgment. Defendants responded that claiming that Breath of Life was a third-party employer contravened the statute's intent and that, even if plaintiff was entitled to overtime pay, she received more than she was entitled to, in light of the value of the lodging that she also received.

¶ 10    On October 27, 2020, the trial court entered a short one-page order stating that: "Plaintiff's Motion for Summary Judgment is granted as to liability and is denied as to damages." The court denied defendant's motion for summary judgment and set the matter "for trial for the determination of damages."

¶ 11                                    II. Bench Trial

¶ 12        At the subsequent bench trial, the witnesses were: the Pratos, plaintiff and Gary Barnes, a real estate broker called by defendants as an expert regarding the value of the lodging they had provided. Since the court below found for defendants, in part, because the value of the lodging exceeded plaintiff's wages, we describe the testimony about it in detail.

¶ 13                                     A. Jack Prato

¶ 14        Jack testified as follows: He is the president and executive director of defendant Breath of Life, as well as an Illinois attorney. The sole purpose of Breath of Life is to provide services to his two handicapped adult children,[3] who are over the age of 40. Breath of Life employs six or seven employees and occasionally employs high-school students on a part-time basis; and he and his wife handle its executive functions. Breath of Life owns a house in LaGrange Park, Illinois, that houses his adult children and an overnight caregiver.

¶ 15        Jack testified that plaintiff was hired as an overnight caregiver and "had no daytime duties." "[H]er job overnight was just to assist the children should they get up and need some assistance to go to the restroom or, you know, some other minor thing that needed attention and then go back to sleep."

¶ 16        Jack testified that plaintiff's salary was $200 per week, plus the value of her lodging. The lodging for the overnight caregiver was a basement apartment in the house that also housed his adult children. At the time that plaintiff was hired, the Pratos and plaintiff discussed "the

_____

[3] During his testimony, Jack referred to the cared-for individuals as his children. Plaintiff referred to them as "two disabled adult females." Since the characterization of the cared-for individuals under the Act is a legal issue which we discuss later in this opinion, we use each witness' terminology in this Background section when describing his or her respective testimony.

value of the apartment *** utilities *** laundry" and the Pratos informed plaintiff that they "would be waiving any charges for any of her residence there." The Pratos "told her that the apartments in this area were roughly running for about $2,000 per month." While there was no employment contract, there was a lease agreement that stated that plaintiff would not be charged rent.

¶ 17    Breath of Life did not maintain a record of the hours that plaintiff worked. Jack explained that plaintiff was "employed to be upstairs with the children during the hours of 10:00 p.m. to 7:00 a.m. in the morning," or seven days a week, nine hours a day, for a total of 63 hours per week. If plaintiff worked outside these hours, she received $12 per hour for any additional hours worked.

¶ 18    The lease agreement, which was admitted into evidence, showed that the rent per month was zero and that no security deposit was required. Jack was present when plaintiff and his wife signed it. The lease was for an "in-law apartment" located in the basement of the LaGrange Park home. Jack testified that an expert retained by defendants estimated that the value of the apartment was between $1800 and $2200 per month. All utilities ran "through one meter." No utility or electrical bills were produced during this litigation.

¶ 19    Jack testified that, when plaintiff started her employment at 10 p.m., "the children were asleep, so she was not actually working." If they rose during the night, plaintiff would be "called to take care of whatever the need was until she could get them settled back into their beds." Jack testified that plaintiff could sleep during her shift and that he did not know how much time she spent "actually working with the client." "90 percent of the time," plaintiff's work ended at 7 a.m. However, there were a few instances when another worker was running late and plaintiff would work an additional half-hour or hour.

¶ 20        Defendants hired plaintiff through a Craigslist ad for a female overnight caregiver. The ad stated that the position included a private apartment with a private entrance and that all utilities, gas, electric, water, heat, air conditioning, garbage service and laundry facilities were included.

¶ 21        Plaintiff's 2016 and 2017 W-2 forms were admitted into evidence. The forms showed that plaintiff's total wages from Breath of Life were $11,206 in 2016, and $6,154.85 in 2017.

¶ 22                                          B. Maria Prato

¶ 23        Maria Prato testified that she supervised Breath of Life's employees, including plaintiff. Between 10 p.m. and 7 a.m., plaintiff was required to have "lights off," make "no noise" and do no cooking. If "the girls" woke up, plaintiff needed to "prompt" them to go immediately either to the bathroom or back to bed, depending on the need. Maria testified that plaintiff was "trained on how to prompt the girls," because they "respond well" to "certain methods." However, plaintiff was not hired based on an advanced degree or any specialized area of knowledge.

¶ 24        Between 10 p.m. and 7 a.m., plaintiff was required to be near the "girls," who were on the first floor. Plaintiff indicated to Maria that plaintiff was more comfortable using plaintiff's own bathroom in her basement apartment, and Maria had "no problem with that." After a brief visit to the bathroom in her basement apartment, plaintiff was expected to return swiftly to the first floor.

¶ 25                                          C. Plaintiff

¶ 26        Plaintiff testified that she was hired from a Craigs list ad to be an overnight caregiver. Although the position included an apartment, she was not allowed to have visitors at her apartment. During the hiring process, the Pratos did not inform her of the value of the lodging

being provided or what the costs were to the Pratos to provide this lodging. The Pratos did inform her that a fingerprint test was required for the position. After her fingerprints were taken and the Pratos told her that she had cleared the security test, she was permitted to start work. Her first day of employment was September 22, 2015, and her employment ended on July 27, 2017.

¶ 27        Plaintiff testified that, when her shift began at 10 p.m., the "two adult disabled women" were supposed to be in bed asleep, "but that wasn't always the case." Plaintiff's job was to respond to them during the night, if they wanted water or to use the bathroom, and then "redirect[ ] them back to the bed and prompt[ ] them to continue" sleeping. Plaintiff helped them approximately 10 times per night. In addition to aiding them with the bathroom, plaintiff had to assist them if one of them "felt sick" or "had a stomachache." "[O]ne time was very complicated," when the medication for one of the women was changed and she did not sleep at night during the transition. "Often" the women would wake up before plaintiff's shift ended at 7 a.m. When plaintiff arrived at 10 p.m., her first duty was to check the first floor, to ensure it was a safe space. For example, one time a knife had been inadvertently left out. "Many times," when plaintiff arrived, there was candy all over the carpet and the bedding, and plaintiff had to clean it up.

¶ 28        During her shift, from 10 p.m. to 7 a.m., plaintiff worked on the first floor and was not allowed to stay in the basement apartment. During her shift, she was not allowed to cook on the first floor or open the refrigerator or make any noise. During her employment, she watched television during her shift "maybe about three times" and had a "short phone call *** just about *** two, three times." The calls concerned her "relative who was terminally ill" and she "had to call a couple [of] relatives concerning the status." During her shift, plaintiff was not allowed

7

to have visitors or leave the premises or open the exterior doors of the house. Plaintiff was also barred from turning on any lights during her shift.

¶ 29 Plaintiff testified that, in addition to her regular overnight shift, she occasionally worked additional hours to cover for another employee. Those additional hours occurred in the morning right after her shift ended or in the evening immediately before her regular shift started. During a 24-hour day, there were three shifts in total: a day shift, an afternoon shift, and plaintiff's overnight shift. When plaintiff covered for another employee, her duties were different, because the daytime shifts required preparing meals and administering medicine. Prior to starting her job, plaintiff had to complete a three-session certification process taught by a nurse practitioner in medication administration and had to pass a test. When plaintiff was needed to work extra hours, Maria Prato would ask her to do so.

¶ 30 A number of texts between plaintiff and the Pratos were marked as a group exhibit and admitted into evidence. The exhibit contained a dozen examples of plaintiff being asked to work additional hours. For example, a text, dated December 6, 2015, at 5:29 p.m., from Maria asked plaintiff to start work at 9 p.m., and plaintiff agreed. Another text from Maria, dated December 25, 2015, at 2:51 p.m., asked plaintiff to start work at 3 p.m. that day, and plaintiff agreed. Plaintiff testified that she received requests to work extra hours by text, email and in person, and that she never declined a request and she never took a day off.

¶ 31 Plaintiff testified that she received $200 per week for working from 10 p.m. to 7 a.m. When she worked hours beyond her regular nine-hour shift, she received additional compensation at the rate of $12 per hour.

¶ 32 On cross-examination, plaintiff testified that the basement apartment had "very limited value," that "a lot of things *** were misrepresented about the apartment," and that "there

8

were a lot of problems" with it. Plaintiff was not asked what the problems were.[4]  Plaintiff

testified that, in calculating her claim for damages, she placed no value on the apartment.  On

redirect examination, plaintiff testified that defendants never mentioned to her either the cost

to them of her lodging or the value of the lodging that they provided.

¶ 33        Prior to resting, plaintiff's counsel moved to dismiss her claims based on the IWPC and

stated that plaintiff was  proceeding only on her claims under the Act.  The trial court granted

the motion, and plaintiff rested.

¶ 34                                                    D. Gary Barnes

¶ 35        Defendants called Gary Barnes, a real estate managing broker with Re/Max Properties,

who testified that he had been a licensed real estate broker for 27 years.  During that time, he

represented both landlords and tenants, and an essential part of his job was valuing rental

properties.  Prior to trial, plaintiff had moved on a number of grounds to bar Barnes from

testifying as an expert. While the trial court did not explicitly state that it found Barnes

qualified as an expert, it denied plaintiff's motion, observing that it was the "gatekeeper" who

decided whether a proposed expert had "the qualifications or the ability to offer relevant and

expert testimony."

¶ 36        Barnes testified at trial that, in August 2019, Maria contacted him about valuing a rental

property, and that, on May 13, 2020, he issued a multi-page report.[5]  To complete his valuation,

he asked the Pratos to estimate the cost to them of the utilities provided, and they estimated

for:  gas, $50 per month; electricity, $35 per month; water, sewer and garbage, $50 per month.

Although Barnes did not receive actual invoices for these items, Barnes relied on the numbers

---

[4] Defense counsel stated:  "I'm not asking about the problems, ma'am."
[5] After Barnes finished testifying, defendants moved to admit Barnes' report into
evidence, and the trial court denied their motion.

provided by the Pratos because he found their estimates consistent with the square footage of the apartment. Although the landlord's payment of these items "definitely adds value to the rental property," Barnes opined that some variation between actual and estimated costs would have little impact on the market value of the apartment.

¶ 37 Barnes found that the rental value of the basement apartment was between $1800 and $2000 per month. Barnes qualified his finding by stating: "we don't know, because we weren't on the market, and the market didn't tell us. But based on the comparable[ ]" apartments on the market between January 1, 2015, and December 31, 2017, "it's not unreasonable to conclude that[,] had we been on the market, we could have rented in that range with the package that we were offering for rent."

¶ 38 The trial court asked Barnes if any of the comparable rental properties that Barnes considered had the restriction, which this lease had, of prohibiting visitors. Barnes said no. The lease between plaintiff and defendants had an absolute ban on pets, smoking and visitors.

¶ 39 E. Maria and Jack Prato, Recalled

¶ 40 The defense recalled Maria and Jack Prato as witnesses in the defense case. Maria testified that she had a bachelor's and a master's degree in education and a doctorate in educational leadership and policy from Loyola University. Maria testified that Breath of Life was "a not-for-profit agency licensed by the State of Illinois to run a group home for two handicapped females," and that the Pratos "created [Breath of Life] after several failed residential situations" with their daughters. Maria testified that her then 43-year-old daughters were unable to care for themselves because they "have no understanding of keeping safe," they cannot cook, and they need help with everyday tasks such as laundry and grocery shopping. Defendants had worked with them for years on "daily living skills," by breaking down tasks

"into very small segments," but "nonetheless, they have not, in all their years, been independent."

¶ 41        Maria testified that, when plaintiff was hired, they explained to her that, although they would pay $12 per hour when plaintiff worked outside of her overnight shift, she would be paid on a different pay scale for the overnight shift because she was not "really dealing *** one on one with the clients very much." By contrast, during the day, "the girls are up, and you have to program for their day." Maria testified that plaintiff worked during the day only a "[h]andful" of times. Prior to initiating this lawsuit, plaintiff did not make any demands for additional compensation.

¶ 42        Jack testified that Breath of Life had applied for and received a property tax exemption, so defendants paid no property taxes for the house, including the basement apartment. Jack explained that "[t]he corporation was actually formed in 2007, and before we created the group home, we also had involvement with various charitable and religious efforts." Based on that involvement and that the house was "now being used for educational" purposes, "it qualified for a property tax exemption."

¶ 43        Jack testified that he was an attorney. Although he never practiced employment law, he did review the Act and observed that the minimum wage was then $8.25 per hour. He believed that it did not pertain to them because they were "providing compensation through housing and the amenities that went with the property." Jack concluded that, "based on the total package, [plaintiff] was well above the current minimum wage in effect at the time." However, he did not consult with another attorney.

¶ 44                                              III. Posttrial Findings

¶ 45            On March 26, 2021, the trial court entered an order finding for defendants. First, the trial court found that defendants were exempt from the Act's overtime-pay requirement pursuant to the Act's exemption for "[a]ny employee of a non-for-profit educational or residential child care institution." 820 ILCS 105/4a(2)(H) (West 2018). Second, the trial court found that "a fair value of [plaintiff's] lodging costs would be $1,000 a month or $250 per week, which if applied to [plaintiff's] weekly wage of $200, satisfies the minimum wage requirement" of the Act. Since the court found that plaintiff failed to sustain either claim under the Act, it entered judgment for defendants, finding that the $250 plus salary more than satisfied what defendants owed plaintiff.

¶ 46            Plaintiff filed a notice of appeal on April 13, 2021. This timely appeal followed.

¶ 47                                                    ANALYSIS

¶ 48                                         I. Statutory Interpretation

¶ 49                                           A. Standard of Review

¶ 50            Plaintiff's claim requires us to interpret the Act's statutory language and decide what it means. The interpretation of a statute is a question of law which we review *de novo. VC&M, Ltd. v. Andrews*, 2013 IL 114445, ¶ 30. *De novo* consideration means that we perform the same analysis that a trial judge would perform. *A.M. Realty Western L.L.C. v. MSMC Realty*, 2016 IL App (1st) 151087, ¶ 72.

¶ 51                                             B. Plain Language

¶ 52            "The fundamental objective of statutory construction is to ascertain and give effect to the intent of the legislature." *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 21 (citing *Bettis v. Marsaglia*, 2014 IL 117050, ¶ 13). "The most reliable

indicator of legislative intent is the statutory language, given its plain and ordinary meaning. *1010 Lake Shore Ass'n*, 2015 IL 118372, ¶ 21 (citing *State Building Venture v. O'Donnell*, 239 Ill. 2d 151, 160 (2010)). "A reasonable construction must be given to each work, clause and sentence of a statute, and no term should be rendered superfluous." *1010 Lake Shore Ass'n*, 2015 IL 118372, ¶ 21 (citing *Slepicka v. Illinois Department of Public Health*, 2014 IL 116927, ¶ 14). " '[W]hen statutory language is plain and certain the court is not free to give it a different meaning.' " *Kalkman v. Nedved*, 2013 IL App (3d) 120800, ¶ 12 (quoting *In re Estate of Hoehn*, 234 Ill. App. 3d 627, 629 (1992)). "[A] court may not depart from the plain statutory language by reading into it exceptions, limitations, or conditions not expressed by the legislature." *Kalkman*, 2013 IL App (3d) 120800, ¶ 12 (citing *In re Estate of Ellis*, 236 Ill. 2d 45, 51 (2009)).

¶ 53                                C. Dictionary Definitions

¶ 54            "When a statute does not define its own terms, a reviewing court may use a dictionary to ascertain the plain and ordinary meaning of those terms." *Maschek v. The City of Chicago*, 2015 IL App (1st) 150520, ¶ 56 (citing *People v. McChriston*, 2014 IL 115310, ¶ 15, and *People v. Bingham*, 2014 IL 115964, ¶ 55); see also *People v. Chapman*, 2012 IL 111896, ¶ 24 ("When a statute contains a term that is not specifically defined, it is entirely appropriate to look to the dictionary to ascertain the plain and ordinary meaning of the term."). When seeking dictionary definitions to interpret a statute, our supreme court has turned first to Merriam-Webster's Dictionary, so we do the same. *Rosenbach v. Six Flags Entertainment Corp.*, 2019 IL 123186, ¶ 32. When interpreting statutes, this court has also relied on definitions from Dictionary.com, so we utilize definitions from both dictionaries. *Sekura v. Krishna Schaumburt Tan, Inc.*, 2018 IL App (1st) 180175, ¶ 53.

13

¶ 55                                    D. Objective

¶ 56          "When interpreting a statute, we do not read a portion of it in isolation; instead, we read it in its entirety, keeping in mind the subject it addresses and the drafters' apparent objective in enacting it." *People v. Miles*, 2017 IL App (1st) 132719, ¶ 25; *People v. Chatman*, 2016 IL App (1st) 152395, ¶ 30. When considering the drafters' objective, we examine the problems that the legislature intended to remedy with the law and the consequences of construing it one way or the other. *People v. Almond*, 2015 IL 113817, ¶ 34 (we "consider the reason for the law and the problems intended to be remedied"); *People v. Eppinger*, 2013 IL 114121, ¶ 21 (legislative intent may be ascertained by considering "the statute in its entirety, its nature and object, and the consequences of construing it one way or the other").

¶ 57          "Statutes must be construed to avoid absurd or unjust results." *Evans v. Cook County State's Attorney*, 2021 IL 125513, ¶ 27. "When a plain or literal reading of a statute leads to absurd results or results that the legislature could not have intended, courts are not bound to that construction." *Evans*, 2021 IL 125513, ¶ 27.

¶ 58                                  E. Legislative History

¶ 59          Where the language is plain and unambiguous, we apply the statute without resort to further aids of statutory interpretation. *In re Lance H.*, 2014 IL 114899, ¶ 11; *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 395 (2003); *Maschek*, 2015 IL App (1st) 150520, ¶ 44 ("If the statutory language is clear, we must apply it, without resort to any aids of statutory construction."). If the statutory language is ambiguous, we may turn to "the statute's legislative history and debates" to ascertain intent. *Maschek*, 2015 IL App (1st) 150520, ¶ 44 (citing *Krohe*, 204 Ill. 2d at 398).

¶ 60                       II. The Statutory Language in 4a is Clear

¶ 61        Section 4a(2)(H) states:

"Any employee of a not-for-profit educational or residential child care institution who (a) on a daily basis is directly involved in educating or caring for children who (1) are orphans, foster children, abused, neglected or abandoned children, or are otherwise homeless children and (2) reside in residential facilities of the institution and (b) is compensated at an annual rate of not less than $13,000 or, if the employee resides in such facilities and receives without cost board and lodging from such institution, not less than $10,000." 820 ILCS 105/4a(2)(H) (West 2018).

¶ 62        The evidence in this case shows that defendants' children were not "orphans, foster children, abused, neglected or abandoned *** or *** otherwise homeless." 820 ILCS 105/4a(2)(H) (West 2018). Therefore, section 4a(2)(H) does not apply to them.

¶ 63        Although the Act does not define "child care," there are a number of Illinois statutes that do, such as the Child Care Act of 1969 (225 ILCS 10/2.01 (West 2018)). When interpreting a statutory word or phrase, " 'we may turn to other codes' " when the other codes share " 'similar goals and related subjects.' " *Sekura*, 2018 IL App (1st) 180175, ¶ 45 (quoting *Maschek*, 2015 IL App (1st) 150520, ¶ 44). The Child Care Act regulates all "child care institutions" in our state (225 ILCS 10/2.01 (West 2018)), while the exemption at issue provides an exemption for a certain subset of those "institution[s]." 820 ILCS 105/4a(2)(H) (West 2018) (providing an exemption for certain, qualified "child care institution[s]"). In relevant part, the Child Care Act provides:   "For purposes of admission to and residence in child care institutions," the term "child" is limited to "a person under 21 years of age." 225 ILCS 10/2.01 (West 2018). Thus, we find that the Act's exemption for a subset of "child care institution[s]" does not apply to the facts of this case. 820 ILCS 105/4a(2)(H) (West 2018).

¶ 64                                III. Case Law & Regulations

¶ 65          In discussing section 4a which provides for overtime pay (820 ILCS 105/4a (West 2018)), plaintiff cites extensively from federal cases.

¶ 66          "There are certain provisions of the Minimum Wage Law that expressly incorporate the [Fair Labor Standards Act of 1938 (FLSA)]'s provisions and regulations." *Samano v. Temple of Kriya*, 2020 IL App (1st) 190699, ¶ 48. For example, subsection 2(e) of section 4a exempts employees employed in an executive or professional capacity and explicitly adopts definitions from the FLSA. 820 ILCS 105/4a(2)(E) (West 2018). *Samano*, 2020 IL App (1st) 190699, ¶ 48. "*[U]nder that provision,* 'our courts have found that '[a] violation of the Illinois Minimum Wage Law is contingent on establishing a violation under the [FLSA].' '" (Emphasis in original.) *Samano*, 2020 IL App (1st) 190699, ¶ 48 (quoting and distinguishing *Resurrection Home Health Services v. Shannon*, 2013 IL App (1st) 111605, ¶ 23).

¶ 67          Based on *Resurrection Home*, plaintiff argues in her brief that the FLSA is "used to determine whether an employer has committed a violation under" the Illinois Act.

¶ 68          However, as explained above, this is true only for the provisions that incorporate the FLSA. "In the case at bar, however, the provisions relied on by" defendants "do not contain such an express incorporation of the FLSA's language or regulations." *Samano*, 2020 IL App (1st) 190699, ¶ 48. Thus, we consider federal cases to be "instructive" but not binding on this court. *Samano*, 2020 IL App (1st) 190699, ¶ 62; see also *Samano*, 2020 IL App (1st) 190699, ¶ 48. As this court has emphasized before, Illinois minimum wage law is "not identical to the FLSA." *Samano*, 2020 IL App (1st) 190699, ¶ 62.

¶ 69          As for relevant regulations, there are administrative regulations that pertain to the second issue, namely, the value of plaintiff's lodging. 56 Ill. Adm. Code 210.200 ("Meals and

Lodging"). However, the parties do not cite nor can we find regulations pertinent to the first issue, namely, whether an exemption in the overtime pay provision applies to defendants.

¶ 70                                    IV. Overtime Pay

¶ 71        Plaintiff argues, first, that the trial court erred by finding that defendants' facility qualified for the Act's "residential child care" exemption that exempts certain facilities from paying an overtime rate. 820 ILCS 105/4a(2)(H) (West 2018). Plaintiff argues that defendants' adult children were not "children" within the meaning of the exemption; and the Pratos respond that the Act fails to define "children" and that the cared-for individuals are indisputably their children.  820 ILCS 105/4a(2)(H) (West 2018).

¶ 72        The overtime-compensation section states that "no employer shall employ any of his employees for a workweek of more than 40 hours" unless the employee receives compensation "at a rate not less than 1½ times the regular rate" at which he or she is employed. 820 ILCS 105/4a(1) (West 2018). However, the section specifically exempts various types of employees, including:

>           "Any employee of a not-for-profit educational or residential child care institution who (a) on a daily basis is directly involved in educating or caring for children who (1) are orphans, foster children, abused, neglected or abandoned children, or are otherwise homeless children and (2) reside in residential facilities of the institution and (b) is compensated at an annual rate of not less than $13,000 or, if the employee resides in such facilities and receives without cost board and lodging from such institution, not less than $10,000."  820 ILCS 105/4a(2)(H) (West 2018).

¶ 73        In the case at bar, the parties are correct that the statute does not define the words "child" or "children" anywhere in the Act. 820 ILCS 105/4a(2)(H) (West 2018). The parties

are also correct that the legislative history is of little help because there is little history concerning the exemption at issue.

¶ 74        The dictionary definitions are also of little help because the dictionaries provide definitions supporting both positions—both plaintiff's position that a child means a young person, and defendants' position that it means a son or daughter. For example, the Merriam-Webster Dictionary defines "child" as both (1) "a young person especially between infancy and puberty" and (2) "a son or daughter" or "descendant." Merriam-Webster Dictionary, http://merriam-webster.com/dictionary/child (last viewed Oct. 20, 2021). Similarly, Dictionary.com defines "child" as (1) "a person between birth and puberty" and (2) "a son or daughter." http://Dictionary.com/browse/child (last viewed Oct. 20, 2021). However, it is not the word "child" that is relevant here because the subsection of the exemption required the children at issue to be "orphans, foster children, abused, neglected or abandoned *** or *** otherwise homeless" (820 ILCS 105/4a(2)(H)(1) (West 2018)); and there is no evidence to support that these children were in that category.

¶ 75        In addition, when asked at oral argument about the subsection of the exemption that required the children at issue to be "orphans, foster children, abused, neglected or abandoned *** or *** otherwise homeless" (820 ILCS 105/4a(2)(H)(1) (West 2018)), defendants conceded that the exemption was not "a perfect fit" for their situation. Defendants admitted that the adults here were "not abused or any of those." Instead, defendants stated that they were arguing for a "narrow extension" of the exemption, which they believed furthered the intent of the statue. However, a statute in derogation of the common law is to be strictly construed. *Thomas v. Khoury*, 2021 IL 126074, ¶ 14. Defendants' concession that the adults

at issue here do not "fit" the plain language of this subsection further supports our finding that the exemption does not apply. [6]

¶ 76                                V. Value of Lodging

¶ 77        Next, we consider whether the trial court was correct in finding that defendants were entitled to a $250 per week credit for lodging, to offset what they owed plaintiff.

¶ 78        Defendants argue that, per the testimony of its expert, Barnes, the lodging was worth between $1800 and $2000 per month. In contrast, plaintiff testified at trial that she placed no value on the lodging when calculating her claim for damages. Plaintiff testified that the basement apartment had "very limited value," that "a lot of things *** were misrepresented about the apartment," and that "there were a lot of problems" with it. The lease agreement showed the rent was zero, and it prohibited plaintiff from inviting visitors to her apartment at any time.

¶ 79        In its order, the trial court struck a middle ground, finding that "a fair value of [plaintiff's] lodging" was "$1,000 a month" or $250 per week. "In a bench trial, the trial court must weigh the evidence and make findings of fact." *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). "In close cases, where findings of fact depend on the credibility of witnesses, it is particularly true that a reviewing court will defer to the findings of the trial court unless they are against the manifest weight of the evidence." *Eychaner*, 202 Ill. 2d at 251. "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or

_____

[6] Plaintiff also argues that the overtime exemption is an affirmative defense which defendants waived by failing to plead and that defendants, as the employer, bear the burden of proving that an employee falls within one of the Act's exemptions. However, since we find that the exemption does not apply here, we have no need to consider these additional arguments.

when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner*, 202 Ill. 2d at 252.

¶ 80      Although the trial court struck a middle ground, there is no evidence in the record to support the particular number that the trial court found. While defendant's expert testified to the fair market value of a lease in this neighborhood, he did not testify to the fair market value of this particular lease with its unusual restrictions.

¶ 81      The trial court went on to find that the "$250 per week, which if applied to [plaintiff's] weekly wage of $200"—or $450 per week—"satisfies the minimum wage requirements." The trial court observed that, at that time, the minimum wage was $8.50 per hour. Since the trial court found that the overtime rate was not required, plaintiff was due, under the trial court's order, $8.50 times 63 hours per week, or $535.50 per week. One can see at a glance that $450 per week is not $535.50 per week—and the latter amount was the amount required *if* plaintiff's overtime claim was rejected, and we have found just the opposite.

¶ 82      We must remand to the trial court to calculate damages. Among other things, the trial court must find the total number of hours worked during each week, the total number of hours that qualified for the overtime rate for each week and the total number of hours that qualified for simply the minimum wage during that same week. In addition, the trial court must consider what, if any, attorney fees, costs, interest and other damages or penalties are due plaintiff, if there is an underpayment of wages. See 820 ILCS 105/12 (West 2018) ("Civil action for underpayment of wages; costs; attorney fees; penalties"). The trial court must determine what, if any, credit is to be accorded this particular lease, with its unusual restrictions, and may hear additional evidence to make that determination.

¶ 83                                        CONCLUSION

¶ 84          For the foregoing reasons, we reverse and remand for further proceedings consistent with this opinion.

¶ 85          Reversed and remanded with instructions.

**No. 1-21-0413**

| | |
|---|---|
| **Cite as:** | *Soucek v. Breath of Life Professional Services, NFP*, 2021 IL App (1st) 180937 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-L-011243; the Hon. Margaret Brennan, Judge, presiding. |
| **Attorneys for Appellant:** | John C. Ireland, The Law Office of John C. Ireland, 636 Spruce Street, South Elgin, IL 60177, for appellant. |
| **Attorneys for Appellee:** | Joseph R. Ziccardi, Ziccardi Law Offices, 77 West Washington Street, Suite 705, Chicago, IL 60602, for appellee. |